## PEOPLE v. HANCOCK.

1. JURY—DRAWING OF NAMES—SUBSTANTIAL COMPLIANCE WITH STATUTE.

Substantial compliance with statute relative to drawing of names of jurors is sufficient where the security contemplated by the statute has been achieved (CL 1929, § 13729; CL 1948, §§ 602.-131, 602.132, 602.135).

·2. SAME—SUBSTANTIAL COMPLIANCE WITH STATUTE—DRAWING OF NAMES—FOLDING SLIP.

Where, although statute required that county clerk place names of persons on jury lists on separate pieces of paper of the same size and appearance and fold up each of such pieces so as to conceal the names thereon, notify the sheriff and two justices of the peace as to time of drawing, place the names in a box, shake the box and publicly draw out of the box one slip at a time, and the names of four jurors were selected without the pieces of paper having been folded but drawn in such a way that the clerk was unable to see the name until the slip had been removed from the box, and there is no showing of fraud or prejudice, there was substantial compliance with the statute achieving the security contemplated thereby (CL 1929, § 13729; CL 1948, §§ 602.131, 602.132, 602.135).

REFERENCES FOR POINTS IN HEADNOTES

[1, 2] 31 Am Jur, Jury, § 101.
[3] 24 Am Jur, Grand Jury, §§ 3, 13.
[4] 8 Am Jur, Bribery, § 16.
[5] 14 Am Jur, Criminal Law, § 240.
[6] 31 Am Jur, Jury, § 126.
[7, 9, 10] 3 Am Jur, Appeal and Error, §§ 374–377.
[7, 9–11] 53 Am Jur, Trial, §§ 459, 505.
[9, 12] 53 Am Jur, Trial, § 506.
[11] 53 Am Jur, Trial, §§ 465, 504.
[14] 53 Am Jur, Trial, §§ 566, 568.
[15, 16] 8 Am Jur, Bribery, § 33.

3. CONSTITUTIONAL LAW—ONE-MAN GRAND JURY STATUTE.

The so-called one-man grand-jury statute is constitutional (CL 1948, § 767.3 *et seq.*).

4. CONSPIRACY—BRIBERY.

The fact that the crime of bribery requires a concert of action does not preclude the existence of a criminal conspiracy between the givers and receivers under a charge of common-law conspiracy to corrupt the legislature by means of bribery.

5. CONSTITUTIONAL LAW—DUE PROCESS—ONE-MAN GRAND JURY—PRELIMINARY EXAMINATION.

Due process was not denied persons charged with common-law conspiracy to corrupt the legislature by bribery by reason of the fact that the circuit judge who conducted a one-man grand-jury proceeding also presided as the examining magistrate, since a preliminary examination is not a proceeding required by the due-process clause of either the Federal or State Constitutions (US Const, am 14, § 1; Mich Const 1908, art 2, § 16; CL 1948, § 767.3 *et seq.*).

6. JURY—QUALIFICATIONS—MARRIED WOMEN—TAX ROLLS—IMPARTIALITY.

Where, on *voir dire* examination three married women, as prospective jurors, stated their names were on the assessment roll but such was not the fact, and it appears they were entitled to have their names on the assessment roll and thereby qualify as jurors, such misstatements did not necessitate a new trial, it also appearing that the jurors believed they were qualified to sit as jurors, there was no showing that the jurors could not and did not act impartially, attorneys for defendants stated they were satisfied at the closing of the selection of the jury and defendants still had available same peremptory challenges (CL 1948, § 602.121).

7. CRIMINAL LAW—SAVING QUESTION FOR REVIEW.

In prosecution for common-law conspiracy to corrupt the legislature by bribery, which developed from a one-man grand jury proceeding, where a defendant, as witness on his own behalf as well as of others, stated that during the grand-jury proceeding the prosecutor made a lunge at him and the prosecutor replied "You know different than that, you know that is a deliberate lie," not having been followed by objection or request for court ruling upon the same *held*, not such an incident as to constitute reversible error.

8. CONSPIRACY—INTENT—EVIDENCE—INSTRUCTIONS.

In prosecution of certain finance company officers and State legislators for common-law conspiracy to corrupt the legislature by bribery in which the information averred such conduct in connection with two bills relating to foreclosure of chattel mortgages and regulating retail and instalment sales contracts covering motor vehicles, it was not error for the prosecution to present evidence of other bills relating to deficiency judgments, repossession of motor vehicles under chattel mortgages, reduction of small loan interest rates, new small loan legislation, specific tax on gross income of finance companies and small loan companies, garage liens for repairs on motor vehicles and pertaining to direct charges on loans made by finance companies in order to show intent, especially where the prosecution and trial judge told jury that no wrongdoing was claimed in connection with such intent items but that they bore on matter of intent only (CL 1948, § 768.27).

9. CRIMINAL LAW—STATEMENTS OF SPECIAL PROSECUTOR—INSTRUCTIONS.

Statements of special prosecutor, in prosecution for common-law conspiracy to corrupt the State legislature by bribery, which referred to the one-man grand juror who had conducted the investigation leading to the charge being made, *held,* not to have constituted reversible error, where defendant did not object thereto nor request that such remarks be disregarded and trial court instructed jury that the evidence upon which they must convict the persons charged with crime came from the testimony of witnesses.

10. SAME—SAVING QUESTION FOR REVIEW.

Objections to statements of special prosecutor, not made at the trial of a criminal case, but made for the first time on appeal will not be considered by the Supreme Court.

11. SAME—ARGUMENT OF PROSECUTOR—COERCION OF JURY—NEW TRIAL.

Argument of special prosecutor in prosecution for common-law conspiracy to corrupt the State legislature by bribery *held,* not sufficient to require a new trial on the ground that it intimated that defendants were morally capable of "fixing" a member of the jury and that the result of the argument was to coerce the jury.

12. SAME—ARGUMENT—CURING ERROR.

Whether there is reversible error in the argument of the prosecution in the trial of a criminal case depends upon all the cir-

stances of the particular case and under some circumstances the prejudicial effect may be eliminated by proper procedure.

13. SAME—CHARGE CONSTRUED AS A WHOLE.
In considering claimed errors in a trial court's charge to the jury in a criminal prosecution, the charge should be construed as a whole.

14. SAME—CHARGE TO JURY.
Trial court's charge to jury in prosecution for common-law conspiracy to corrupt the State legislature by bribery, when construed as a whole, *held*, not to have contained prejudicial statement or instruction or to have unduly stressed the claims of the prosecution in trial which lasted for approximately two months.

15. CONSPIRACY—BRIBERY—EVIDENCE—QUESTION FOR JURY.
In prosecution for common-law conspiracy to corrupt the State legislature by bribery, evidence presented a question of fact as to whether there was such a conspiracy and also whether any or all of defendants charged participated in such conspiracy, especially where the central figure and principal witness for the prosecution testified he was engaged in bribery on a large scale.

16. CRIMINAL LAW—WITNESSES—CREDIBILITY.
In a prosecution for crime, the jury may believe one witness as against many and where witnesses contradict themselves and each other, it is for the jury to determine their credibility.

REID and BUSHNELL, JJ., dissenting.

Appeal from Ingham; Simpson (John), J., presiding. Submitted May 19, 1949. (Docket No. 65, Calendar No. 42,918.) Decided January 9, 1950. Rehearing granted February 28, 1950. See 328 Mich 143.

John E. Hancock and others were convicted of a conspiracy to corrupt the legislature of the State of Michigan by bribery. Affirmed.

*Stephen J. Roth*, Attorney General, *Edmund E. Shepherd,* Solicitor General, *Daniel J. O'Hara,* Assistant Attorney General, and *Richard B. Foster,* Special Assistant Prosecuting Attorney, for the people.

*James E. Haggerty (Hugh V. Williams,* of counsel), for appellant Hancock.

SHARPE, J.   Defendant, John Hancock, and others were tried, convicted and sentenced under an information which charged them with a criminal conspiracy to corrupt the 1939 legislature of the State of Michigan by the act of bribery.

The information, under which defendant was tried and convicted, reads as follows:

"Victor C. Anderson, prosecuting attorney for the county of Ingham, for and in behalf of the people of the State of Michigan, comes into said court in the March term thereof for the year 1944, and gives the court to understand and be informed:

"That heretofore, to-wit: On the 1st day of January, 1939, and on divers other days and times between that time and the 1st day of July, A. D. 1939, at the city of Lansing, and in the county of Ingham aforesaid, John Hancock, George Omacht, Mark S. Young, Samuel Hopkins, Abraham Cooper, Ernest G. Nagel, Earl C. Gallagher, William G. Buckley, Joseph J. Kowalski, Walter N. Stockfish, Martin A. Kronk, Stanley J. Dombrowski, Adam W. Sumeracki, Joseph L. Kaminski, Michael J. Clancy, Francis J. Nowak, Edward J. Walsh, Charles C. Diggs, D. Stephen Benzie, Henry F. Shea, William M. Bradley, Jerry T. Logie, and Leo J. Wilkowski, did unlawfully and wickedly agree, combine, conspire, confederate and engage to, with and among themselves, and to and with each other and to and with divers other persons to me unknown, wilfully and corruptly to affect and influence the action of the

legislature of the State of Michigan, the senate, the house of representatives, and divers members thereof, in the consideration of and action on certain proposed legislative measures then and there pending in and before said legislature, senate and house of representatives, to-wit:

"Senate Bill No 85, entitled:

" 'A bill to provide the procedure for the foreclosure of chattel mortgages and to limit the right to deficiency judgments thereunder and to repeal all acts and parts of acts inconsistent with the provisions of this act.'

"Senate Bill No 166, entitled:

" 'A bill to regulate retail and instalment sales contracts covering motor vehicles; to prescribe penalties for the violation of the provisions of this act; and to repeal all acts and parts of acts inconsistent herewith,' and divers other measures and bills then and there pending in and before said legislature, the senate and the house of representatives, by then and there offering, tendering, promising, giving and receiving of bribes, money, and other things of value; and by promises to accept and receive such bribes, money, and other things of value; and by the actual giving and receiving of the same, they, the said Charles C. Diggs, D. Stephen Benzie, Henry F. Shea, William M. Bradley, Jerry T. Logie, and Leo J. Wilkowski, being then and there duly elected, qualified and acting members of the senate of the State of Michigan; and Ernest G. Nagel, Earl C. Gallagher, William G. Buckley, Joseph J. Kowalski, Walter N. Stockfish, Martin A. Kronk, Stanley J. Dombrowski, Adam W. Sumeracki, Joseph L. Kaminski, Michael J. Clancy, Francis J. Nowak, Edward J. Walsh, being then and there duly elected, qualified and acting members of the house of representatives of the State of Michigan; and it being then and there the duty of said members of the said senate and of the house of representatives to refrain from the acceptance of the promises of bribes, bribes, money, or other things of value, made, offered, or given for

the purpose or with the intent of influencing such members in the performance of their official duties and particularly in the consideration of and action on bills and proposed legislation pending before such legislature, senate and house of representatives, and they, the said John Hancock, George Omacht, Mark S. Young, Samuel Hopkins, and Abraham Cooper, being then and there interested in the proposed legislative measures aforesaid, and in other measures then and there pending before said legislature, senate and house of representatives, and it being then and there their duty to refrain from the making of promises, the offering, tendering or giving of bribes, money or other things of value whatsoever to the members of said senate and house of representatives, or to any one of such members for the purpose and with the intent of influencing said members of the senate or the house of representatives of the State of Michigan, or any of them, in the performance of the official duties of such members, and particularly in the consideration of and action on the proposed legislative measures aforesaid, or any bill or proposed legislation pending in and before said legislature, senate and house of representatives, nevertheless well knowing their respective duties aforesaid, said defendants did corruptly, dishonestly, fraudulently, and illegally engage and participate in said conspiracy and confederate as aforesaid, contrary to the form of the statute in such case made and provided, and against the peace and dignity of the people of the State of Michigan."

The original warrant named 26 defendants. For the purpose of convenience they are referred to as 6 "finance defendants" and 20 legislators. Of the 6 finance defendants, one Ernest J. Prew pleaded guilty on arraignment. One of the legislator defendants, namely Miles M. Callaghan, also pleaded guilty, but at the time of the trial was too ill to testify and his testimony taken at the preliminary examination was read into the record. He is now

deceased. One other legislator was granted a separate trial as he was then serving in the United States Navy. The trial proceeded with 5 finance men and 17 legislators as defendants. The jury acquitted 2 of the former group and convicted 3 finance defendants and all 17 legislators.

Prior to the trial of the cause and on June 2, 1944, defendant Hancock made a motion to quash the information and discharge defendant for the following reasons, among others:

Because the information is based upon an examination arising from an investigation conducted by a circuit judge of Ingham county under the purported authority of CL 1929, §§ 17217, 17218* (Stat Ann §§ 28.943, 28.944) which statutes are unconstitutional and void, being in contravention to the provisions of sections 1 and 2 of article 4, section 9 of article 7, and section 16 of article 2 of the Michigan Constitution; and section 1 of the 14th amendment to the Constitution of the United States;

Because the information is based upon an examination not held pursuant to any formal complaint, but arising from an investigation by Judge L. W. Carr who employed paid investigators and detectives and performed the duties and functions cast upon the prosecuting attorney and other officers of the executive department of the State of Michigan;

Because the information does not comply with CL 1929, § 17217 *et seq.;*

Because the information charges no crime known to the common law;

And because the information is fatally defective in that the allegations are indefinite and uncertain.

On June 6, 1944, an answer was filed by the prosecuting attorney in which there was a denial of the allegations contained in the motion and on the same

---

* CL 1948, §§ 767.3, 767.4. CL 1929, § 17218, was amended by PA 1947, No 33.—REPORTER.

day an order was entered by the trial judge denying the motion to quash the information.

On June 12, 1944, an order was entered to impanel a jury of 14 and on the same day an order was entered denying the motion to discharge the entire panel of jurors and adjourn the cause.

On June 15, 1944, defendant Hancock and other defendants filed a challenge to the array and moved to quash the panel of jurors drawn April 18, 1944, and the panel drawn May 29, 1944, to serve at the May term of court, also the panel drawn on June 6th and 12th to serve at the June term of court for the following reasons:

"1. The panel drawn on April 18, 1944, to be summoned to attend on this court for the May, 1944, term thereof was and is void and of no effect for the reason that no order was at any time entered by this court authorizing and directing the calling of the 40 persons to be summoned to attend on this court at the May, 1944, term thereof, as required by CL 1929, § 13745.*

"2. Said panels are void and the persons named thereon are disqualified to act as jurors for the reasons that the county clerk did not comply with the provisions of CL 1929, § 13729,† and did not fold up the pieces of paper containing the names of the persons returned to serve as petit jurors pursuant to CL 1929, § 13726,‡ so as to conceal the names thereon.

"3. The panel of jurors drawn on May 29, 1944, and the panel of jurors drawn on June 6, 1944, and also the panel of jurors drawn June 12, 1944, as aforesaid, are void and of no effect for the reason that the orders directing the drawing of such additional number of jurors on said respective panel were not made within the period required by CL

---

* CL 1948, § 602.143 (Stat Ann § 27.268).—REPORTER.
† Amended by PA 1947, No 192 (CL 1948, § 602.127 [Stat Ann 1947 Cum Supp § 27.252]).—REPORTER.
‡ CL 1948, § 602.124 (Stat Ann § 27.249).—REPORTER.

1929, §§ 13745, 13746,* in that such orders were made less than 20 days previous to the time specified by law for the making thereof.

"4. The panel of jurors drawn on May 29, 1944, and the panel of jurors drawn on June 6, 1944, and also the panel of jurors drawn June 12, 1944, as aforesaid, are void and of no effect for the reason that they are not authorized by CL 1929, §§ 13745, 13746 or 13747,† or either of them."

On June 14, 1944, the trial court denied the challenge to the array and motion to quash the panel of jurors. The cause came on for trial and lasted approximately 2 months.

It was developed during the trial that in 1939 there were 2 groups other than banking interests engaged in financing. One group was engaged in making short-term loans to individual creditors and were members of an organization known as the Michigan Association of Personal Finance Companies which later changed its name to Michigan Association of Small Loan Companies. The other group was engaged mainly in granting secured loans and in 1939 organized as the Michigan Finance Association.

In November of 1938, a meeting was held in Chicago by the American Finance Conference. Among the Michigan delegates at this meeting were Abraham Cooper and Ralph Smith who were members of the Michigan small loan association. Subsequent to this meeting, it was learned that the small loan group was planning to introduce legislation in the 1939 Michigan legislature which would be detrimental to the interests of the finance group. About this time Cooper made arrangements for a meeting in Detroit on December 1, 1938, at which time from

---

* CL 1948, §§ 602.143, 602.144 (Stat Ann §§ 27.268, 27.269).— Reporter.

† CL 1948, §§ 602.143–602.145 (Stat Ann §§ 27.268–27.270).— Reporter.

26 to 30 persons were present. At this meeting certain proposed legislation to be presented by the small loan group was discussed. One such bill under discussion later became known as Senate Bill No 41. It was decided at this meeting that members of the legislature should be contacted to determine their attitude towards the proposed legislation. Contributions were asked for. Among those present at this meeting were Cooper, Smith and Hancock.

The next meeting of this group was held January 12, 1939. Among others, there were present Clifford, Smith, Otis, Hancock, Cooper, Young and Prew. The advisability of retaining a lobbyist was considered. On January 20, 1939, another meeting was held and an attorney was retained on a per diem basis, but it was felt that the attorney would not be able to give the representation that the group wanted in Lansing and other agents were considered. The name of Charles F. Hemans had been suggested, but it was thought by some that inasmuch as Hemans was under retainer by the small loan group he would not be available. However, a meeting was arranged with him for January 26, 1939. At this meeting the topics of conversation were the proposed bills of the small loan group and the fee to be charged by Hemans. An arrangement was entered into with Hemans whereby he was to receive a minimum fee of $2,500 plus an expense account.

It appears that Hemans had a suite of rooms in a Lansing hotel well supplied with liquid refreshments for the entertainment of invited guests. It also appears from the testimony given by Hemans that he entered into agreements with the defendant legislators whereby if they would vote on Senate Bills Nos 85 and 166 as he suggested they would receive money in varying amounts; and that so-called bribery payments were made pursuant to such

agreements on behalf of the finance group as well as the small loan group.

The people produced evidence that on January 23, 1939, defendant Hancock opened a "special account" in the National Bank of Detroit and made a deposit of $700 and thereafter made additional deposits totalling $7,570.52; that Hancock, as treasurer of the legislation committee, sent Hemans checks in varying amounts totalling several thousand dollars; that Senate Bill No 41 (small loan bill) was introduced in the senate and referred to the committee on State affairs; that Senate Bill No 85 (deficiency judgment bill) was introduced into the senate and referred to the committee on judiciary; that Senate Bill No 166 (relating to instalment sales contracts) was introduced and referred to the committee on judiciary; that defendant Hancock and others wanted Senate Bill No 166 reported out of the judiciary committee of the senate without amendment; that Hemans talked with Hancock concerning the payments that would be expected to be made to the defendant legislators; that Hemans paid Ernest Nagel $125 for the purpose of influencing his vote on Senate Bills Nos 85 and 166 and paid Senator Callaghan $150 for his votes on Senate Bills Nos 85 and 166; paid Earl Gallagher $125 for his votes on the mentioned bills; paid William G. Buckley $100 for his vote on the above bills; paid Joseph J. Kowalski $100 for his vote on said bills; that Walter N. Stockfish was paid $450 for the votes of himself, Adam W. Sumeracki, Stanley J. Dombrowski and Martin A. Kronk; that Joseph L. Kaminski was paid $100; that Francis J. Nowak was paid $150; that Leo J. Wilkowski was paid $250; that Edward J. Walsh was paid $150; that Charles C. Diggs was paid $250; that Stephen Benzie was paid $300; that Henry F. Shea was paid $250; that Jerrie T. Logie was paid $300; and that all payments made or agreed to be

paid were made pursuant to an agreement arrived at between Hemans and the finance defendants on January 26, 1939, at Abraham Cooper's office in the city of Detroit and in subsequent conversations between Hemans, Hancock and Omacht.

The cause came on for trial and at its conclusion defendant Hancock among others was convicted and sentenced to a term in prison.

On August 30, 1944, defendant Hancock and Omacht made a motion for a new trial, giving as their reasons, among others, that defendants have not had a fair trial guaranteed by the Constitution of Michigan and the 14th Amendment to the Constitution of the United States because of prejudicial "assertions, statements and arguments" by the prosecution; and because of erroneous instructions of the court.

On September 1, 1944, Hancock and Omacht filed an amendment to their motion for a new trial adding the following:

"6. Because the jury which returned the verdict in this cause was unlawfully and illegally constituted, and each of these defendants was thereby denied the right to trial by jury guaranteed to him by article 2, §§ 13 and 19 of the Constitution of the State of Michigan (1908), in that:

"(a) The selection of the persons, *viz:* Florence Wilcox, Floris (Florence) Bowen, and Mabel V. Graham, who served as jurors in this cause, and the inclusion of their names on the lists transmitted to the county clerk to serve as jurors was wholly unauthorized by law and constituted a violation of law, for the reason that they were not persons assessed on the assessment rolls for the year 1943, of the respective township or ward in which they resided, and from which they were selected to serve as jurors.

"(b) Each of said jurors, when questioned on their *voir dire* examination, to ascertain not only their qualifications and eligibility to serve as jurors in the

trial of this cause, but also to enable the defendants to ascertain whether their names were properly and lawfully included on the panels of prospective jurors, and whether they were persons to whom these defendants might have grounds to challenge for cause, did severally state, under oath that they were persons assessed on the assessment roll of the township or ward of their respective residences, whereas in fact their names were not on such assessment roll, and each of such persons did thereby deceive these defendants and their counsel with respect to such fact, and thereby caused these defendants and their counsel to believe that said persons were not, for such reason, subject to challenge for cause, and did thereby so deceive these defendants and their counsel as to cause them to refrain from challenging such persons for cause, and thereby preventing them from sitting as jurors in this cause.

"(c) These defendants did not know, and did not have any reason to believe, until after the filing of their aforesaid motion for a new trial, that the names of the aforesaid persons did not appear on said assessment rolls, and that therefore their names should not have been returned on the lists transmitted to the county clerk as persons to serve as jurors."

On October 2, 1944, an order was entered denying the motions for a new trial.

Upon leave granted, defendant Hancock appeals and urges that in the selection and impanelling of the jury he was denied his constitutional rights to an impartial jury and to due process of law in that 4 of the jurors who participated in the verdict were drawn for jury service in violation of CL 1929, § 13729 (Stat Ann § 27.252). The above section provides that "On receiving such lists, the county clerk shall file the same in his office, and shall write down the names contained therein on separate pieces of paper of the same size and appearance as nearly as

may be; and shall fold up each of such pieces of paper so as to conceal the names thereon."

It appears that when a portion of the jury had been drawn, it was discovered that the papers with the names thereon were not folded so as to conceal the names thereon. When this situation came to the attention of counsel for one of the defendants, the following occurred:

"*Mr. Youngjohn:* May it please the Court, on behalf of defendants Hopkins and Cooper, I wish to interpose an objection to the manner in which the jury is being drawn, in that the statutory requirements are not being complied with and have not been complied with from the time the first prospective juror's name has been called. This matter has just come to my attention this morning and I believe it is my duty toward the clients I represent, to call it to the court's attention, and make objection and move the court strike the names of the jurors now in the jury box, and to discharge the entire panel of prospective jurors now before the court. * * *

"*The Court:* Mr. Clerk, how are you drawing them out of the box there,—slips of paper in the box, are they?

"*The Clerk:* That is right, slips of paper in the box, but not folded or rolled.

"*Mr. Youngjohn:* May I inquire of the clerk as to whether the names on the several slips are concealed in the condition that they are in the box?

"*The Clerk:* Only in so far as it is covered.

"*Mr. Youngjohn:* When the box is open the names are not concealed?

"*The Clerk:* No, sir.

"*Mr. Youngjohn:* In respect to the ballots which have already been drawn, have they been folded?

"*The Clerk:* No.

"*Mr. Youngjohn:* Have they been rolled or folded in such a way that the names are concealed?

"*The Clerk:* They are not. * * *

"*The Court:* I am satisfied that there has been absolute secrecy, so far as the drawing of those names is concerned. Mr. Hilliard has been very diligent about it. The names are put in this box and the box is closed and the names have been shaken up. As the drawing showed, it has been pretty well scattered over the list and he has reached in and gotten the different names out of there without looking into the box to determine who the jurors are. Now then, I am satisfied that so far as we have gone, there has been no irregularity in the drawing of this jury. He has not seen the names before, and not only that, at least 7 or 8 attorneys for the various defendants have sat across the counsel table, and have seen the box and the way the jurors have been drawn. They aren't over 6 to 8 feet from the box. And Mr. Watson has been sitting right at the side of it, within 2 feet of it, and saw the way the clerk has drawn them, and the same applies largely to other attorneys,—they have been very congested here and I am satisfied they have been drawn fairly and impartially. I think that was the purpose of the statute, so as not to know who was drawn until the name was drawn. Now, Mr. Clerk, can you trim those lists down a little bit and put them in capsules so we can start out at 1:30 with the capsules?"

On June 14, 1944, Mr. Ross Hilliard, clerk of Ingham county, was sworn and testified:

"On June 12th, we drew a list of jurors to be summoned for attendance in this case for the day of June 14th. Present at that time were William Seelye, justice of the peace of the city of Mason; William Hartzog, justice of the peace of the city of Mason; Sheriff Allan MacDonald, and myself. Also Nelson Brown, editor of the Ingham County News, and Mrs. Mygrants, a deputy in my office.

"*Q.* Will you explain to us just what you did, sir?

"*A.* Yes. The slips are placed in envelopes for each township and ward. They are on typed slips, —typed on slips of paper. They are put into the

jury box, the jury box was shaken up, and the slips drawn out, handed to the sheriff, who reads the names, and the two justices write them on lists that are provided, and Mrs. Mygrants writes in a book which we keep in the office for that purpose.

"Q. Will you describe those papers that you have identified as slips that you drew from the packages, or whatever you drew them out of?

"A. Well, they are slips, practically 1½ by probably 2 inches long, upon which is typed the name of the ward or township, the name of the person and their address. The name of the township or the ward and city is on the outside of each envelope. The several envelopes for the several townships or wards are not consecutively numbered, they are arranged alphabetically, and by number of wards in the city.

"Q. And were those slips which you have identified upon which appears among other things the name of the prospective jurors folded or rolled in any respect?

"A. They were not.

"Q. At the time that you took them from the envelopes and put them into a box, were the names and the other writing on the slips visible to those who chose to look at them?

"A. Well, they could have looked into the box, yes.

"They were neither rolled nor folded. Those that were right side up would have been visible.

"The envelopes for the several wards and townships were not serially numbered 1 to 28 and the several slips in each separate envelope were neither folded nor rolled so as to conceal the name or the writing thereon. That is true with respect to every ballot or every slip in every envelope. That was also true on April 18, 1944, when we first drew the list of jurors for the May term.

"They were not folded or rolled, on May 29th, when we drew 60 additional names, nor on June 6th

when we drew 50 additional names, nor on June 12th, when we drew 50 additional names.

"*Q.* Of the remaining slips in the envelope which have been returned in accordance with the provisions of the statute, if they have been returned, are they now folded?

"*A.* They are. We folded those last night.

"*The Court:* Were these names placed in this box you used here as a box for the drawing of jurors out here?

"*A.* They were.

"*The Court:* Then the names were taken from those envelopes of townships or wards, whatever they were, one at a time?

"*A.* Each ward and township, one at a time, yes.

"*The Court:* Then what did you do?

"*A.* Put them into the box and would shake the box and then draw out one slip at a time. I did not see whose name I was going to draw out before I drew it.

"*The Court:* Was it done secretly as to the drawing of that name,—reaching in your hand and drawing it out so you couldn't see who it was?

"*A.* That is right, it was, yes.     *     *     *

"*Q.* On the occasion of April 18, 1944, as I understand you, this particular box that is here in the court room was in your private office downstairs?

"*A.* That is right.

"*Q.* And where was this box located at the time you made the drawing?

"*A.* I sat at my desk, with the arm rest pulled out, and the box was there on the desk,—on the corner of the desk, to my immediate right here. The slide was out, but the box was not on it. I was sitting in the chair back of the desk. The 2 justices sat at the table, probably 3 feet away maybe. One was seated along the side of the table with his back to the wall, the other was seated at the end of the table.

"*Q.* Were either of these justices of the peace in a position such that if this box had been open completely, they could have looked into it?     *     *     *

"*A.* Well, they certainly would have been unable to have seen into the box from where they were sitting. The sheriff sat immediately to my right. Maybe a foot.

"*Q.* Then if I understand you correctly, you took the names from each envelope and put them,—or the slips, rather, containing the names, from each envelope and put them in that box?

"*A.* Yes, sir and closed the slide and shook the box. After I had done that, I then pulled the slide open a sufficient distance to get my hand in. I did not see at any time those names that were in this box. That was the system I followed throughout the entire drawing. It is the same system I have followed for years.

"*Q.* Was anyone there who was in position where they could have seen into that box?

"*A.* I believe not."

Later the same day the following occurred:

"*Mr. Haggerty:* May it please the court, in reference to my motion to challenge the array I take it your Honor has overruled my motion.

"*The Court:* That is other than what I have already done, striking out 22 or 23 remaining on the original 40. As to other jurors called on later orders by Judge Hayden and myself, they are to remain.

"*Mr. Haggerty:* For the purpose of the record, I take an exception.

"As the trial progresses and the jury is drawn, may it be understood on the record that we do not waive any of our rights as originally set forth in the original petition of the challenge to array.

"*The Court:* It may not only to yourself but every defendant involved."

It is undisputed that there was not strict compliance with CL 1929, § 13729, insofar as 4 of the jurors were concerned.

Section 602.131, CL 1948 (Stat Ann § 27.256), provides:

"At least 3 days before the drawing of such jurors, the clerk shall give notice to the sheriff and 2 justices of the peace of said county, of the day and hour when such drawing will take place."

"At the time so appointed, it shall be the duty of the sheriff of the county in person, or by his under sheriff, and the justices aforesaid, to attend at the clerk's office of the county, to witness such drawing; and if any two of said officers shall attend at the time and place appointed, the clerk shall proceed in their presence to draw the jurors." (CL 1948, § 602.132 [Stat Ann § 27.257].)

Section 602.135, CL 1948 (Stat Ann § 27.260), provides:

"The clerk shall conduct such drawing as follows:

"1. He shall place in a box prepared for that purpose, first only the names contained in 1 of said packages, and he shall then shake the box so as to mix the slips of paper upon which such names were written as much as possible;

"2. He shall publicly draw out of said box 1 slip of paper, and hand the same to the officer in attendance whose duty it is to keep a minute of the names drawn."

It is not disputed that the above section of the statute was complied with. It appears that the manner of drawing the names was such that the names were not seen by the clerk. It follows that the security contemplated by the statute was achieved. While the terms of the statute should be pursued, yet in the absence of fraud or a showing of prejudice, we are constrained to hold that substantial compliance with the statute was sufficient.

It is urged that the trial court erred in overruling defendant's motion to quash the information. The basis of this motion is that the one-man grand jury statute (CL 1948, § 767.3 *et seq.* [Stat Ann § 28.943 *et seq.*]) is unconstitutional; that an agreement be-

tween bribe-givers and bribe-takers is inherent in the substantive offense of bribery, therefore, the agreement itself cannot be charged as a criminal conspiracy; and that defendant was denied due process of law in violation of the State and Federal Constitutions, in that the judge, who acted as one-man grand juror and issued the warrant, also presided over the preliminary examination, and defendant was thereby deprived of an unbiased and unprejudiced tribunal in the conduct of the preliminary examination.

It is admitted that the so-called one-man grand-jury statute was held constitutional in *Re Slattery,* 310 Mich 458. There is no merit to defendant's claim that "since bribery requires a concert of action the agreement between the givers and receivers does not constitute a criminal conspiracy," see *People* v. *DeLano,* 318 Mich 557.

It is also urged that defendant was denied due proces under the Federal Constitution by the act of the one-man grand juror in presiding as the examining magistrate. We find no merit in this claim, see *People* v. *McCrea,* 303 Mich 213. In our opinion the trial court was not in error in overruling defendant's motion to quash the information.

It is also urged that the trial court was in error in failing to grant defendant's motion for a new trial, based upon the fact that 3 jurors, namely, Florence Wilcox, Floris Bowen, and Mabel Graham were not persons assessed on the assessment rolls for the year 1943 of the township or ward in which they resided and from which they were selected to serve as jurors. It appears that on the *voir dire* examination Mrs. Bowen, when questioned, answered that she was a taxpayer; Mrs. Graham said that her name was on the assessment roll; and Mrs. Wilcox stated that her name was on the tax roll.

In affidavits filed in this cause Mrs. Bowen stated that she and her husband own their home in the city of Lansing as tenants by the entireties; that she and her husband have paid taxes on this property for a period of 8 years; and that she believed her name was on the tax rolls. Mrs. Graham stated that she and her husband were purchasing a home in the city of Lansing on a land contract as tenants by the entireties; that they have lived in Lansing for 21 years and have paid taxes on said property and knows of no reason why her name was omitted from the tax rolls. Mrs. Wilcox stated that she and her husband have owned a farm in White Oak township, Ingham county, as tenants by the entireties, since 1933 and have paid real estate taxes on said property and knows of no reason why her name was omitted from the tax roll.

It is apparent that all 3 jurors believed that they were qualified to sit as jurors and that while their answers to the questions were misstatements, there was no intention to deceive anyone, moreover, they were entitled to have their names on the assessment roll and thereby qualify as jurors.

In denying a motion for a new trial the trial court stated, "Here at the closing of the selection of the jury, you say you were satisfied. You had peremptories still left that you could have exercised, had you thought you were not getting a fair jury."

The statute governing the qualifications of jurors is CL 1948, § 602.121 (Stat Ann § 27.246), which provides:

"The said officers shall proceed to select from the persons assessed on the assessment roll of the township or ward for the same year, suitable persons, being citizens, having the qualifications of electors, to serve as jurors; and in making such selection, they shall take the names of such only as are not exempt from serving on juries, who are in possession

of their natural faculties, and not infirm or decrepit, of good character, of approved integrity, of sound judgment, and well informed and conversant with the English language, and free from all legal exceptions, and who have not made, and in whose behalf there has not been made, to the officers mentioned in the preceding section, any application to be selected and returned as jurors."

In *People* v. *Avery,* 244 Mich 644, defendant was convicted for a violation of the prohibition law. It appears that 3 of the jurors were not "persons assessed on the assessment roll of the township or ward." There was no challenge for cause on that ground and counsel for defendant did not know this fact until after verdict. We there held that being assessed for taxes is not a necessary qualification although it is ground for challenge for cause and objection to the jurors should have been made before trial. In *People* v. *DeHaven,* 321 Mich 327, 2 jurors failed to disclose the fact that a relative of theirs had been sentenced to prison for a crime similar to the one charged in the information against defendant. In reversing the judgment of conviction we said, "the relationship of these 2 jurors to one who had committed a similar crime was such that it deprived them of the capacity to act impartially." In the case at bar there was no showing that the 3 jurors could not and did not act impartially. Under the circumstances of this case the jurors were not disqualified to act as jurors.

It is also urged that the prosecutor's statement, purporting to be predicated upon his own personal knowledge, that defendant's witness Omacht was deliberately giving false testimony violated defendant's right to a fair and impartial trial.

It appears that Omacht was a witness before the one-man grand jury and at the trial he was a witness in his own behalf as well as on behalf of Han-

cock and the other finance defendants. The prosecution, in his cross-examination of Omacht at the trial, made reference to and quoted from certain grand-jury testimony given by Omacht. Omacht testified that during the grand-jury proceedings the prosecution made a lunge at him, whereupon the prosecutor replied, "You know different than that, you know that is a deliberate lie." It is noted that no objection was made to this statement nor was there a request for a court ruling upon the same. The statement made by the prosecutor was in answer to an assertion by the witness. In our opinion the incident was not of sufficient importance to constitute reversible error.

It is also claimed that it was error to permit the introduction of so-called intent bills for the following reasons:

"First, error in receiving these bills in evidence at all, in view of the prosecutor's statement that no inference of wrongdoing on the part of the finance defendants with respect to any of these bills was being drawn.

"Second, the prodigious mass of testimony pertaining to these bills and their legislative status from time to time, including the ultimate fate of these bills in the legislature, overshadowed the real question, namely, whether or not the finance defendants had been guilty of the wrongdoing charged with respect to Senate Bills Nos 85 and 166.

"Third, the court compounded these errors by a clearly unsound and erroneous ruling that such evidence had probative force with respect to the guilt of the finance defendants in regard to Senate Bills Nos 85 and 166, and by charging the jury that such evidence, while it had no bearing as to guilt of defendants with reference to the intent bills themselves, did have a bearing upon the defendants' guilt of conspiracy as to Senate Bills Nos 85 and 166."

The bills introduced pertained to deficiency judgments, repossession of motor vehicles under chattel mortgages, to reduction of small loan interest rates; a proposed new small loan bill known as Senate Bill No 41, a specific tax on gross income of finance companies and small loan companies; garage liens for repairs on motor vehicles and pertaining to indirect charges on loans made by finance companies. The prosecution offered and the court received them in evidence as so-called "intent items" under CL 1948, § 768.27 (Stat Ann § 28.1050), which reads as follows:

"In any criminal case where the defendant's motive, intent, the absence of mistake or accident on his part, or the defendant's scheme, plan or system in doing an act, is material, any like acts or other acts of the defendant which may tend to show his motive, intent, the absence of, mistake or accident on his part, or the defendant's scheme, plan or system in doing the act, in question, may be proved, whether they are contemporaneous with or prior or subsequent thereto; notwithstanding that such proof may show or tend to show the commission of another or prior or subsequent crime by the defendant."

We note that the original information charged a criminal conspiracy "corruptly to affect and influence the   action of the legislature of the State of Michigan   *   *   * in the consideration of and action on certain proposed legislative measures," namely, Senate Bill No 41, the small loan bill, Senate Bill No 85, the deficiency judgment bill, and Senate Bill No 166, a bill to regulate retail and instalment sales contracts covering motor vehicles. At the opening of the trial the prosecutor was permitted to amend the information by withdrawing therefrom all reference to Senate Bill No 41. It also appears that during the trial considerable testimony was admitted regarding Senate Bill No 41 as well as other pending

bills over objections of counsel for the several defendants.

It is difficult to lay down any fixed rule as to what the trial court may do in admitting or rejecting proffered evidence under the above statute. In order that the jury could understand the scheme of corruption charged against the defendants it was advisable for them to have some knowledge of all pending legislation upon subjects that the defendants were interested in. It is to be noted that when the first of this evidence was being introduced, the prosecutor stated that there was no claim that the defendants were guilty of any wrongdoing in connection with any of the so-called intent bills. In our opinion such evidence was admissible, see *People* v. *Reading,* 307 Mich 616. Nor can it be said that such evidence overshadowed the real questions. In connection with the above issue the trial court charged the jury as follows:

"I further charge you, Ladies and Gentlemen of the Jury, that certain testimony relating to matters occurring prior to January 1, 1939, and after July 1st of the same year has been received in evidence; and I instruct you that such evidence was received only for such bearing as you may find it has upon the intent of one or more of the defendants, or such explanation as you may find that it gives to their action or conduct during the progress of the alleged conspiracy as hereinbefore stated."

We think the charge was within the intent and meaning of the statute above quoted.

It is also urged that the prejudicial argument of the special prosecutor deprived defendant of due process of law in that he went outside the record to heap effusive praise upon the grand juror who issued the warrant; that it was intended to lead the jury to believe that the issuance of the warrant evidenced the grand juror's belief that the finance de-

fendants should be convicted and portrayed Judge Carr as the patron or sponsor of the prosecution and as believing that a conviction of defendant would be in the public interest.

The following excerpts are taken from the prosecutor's argument to the jury:

"How did the grand jury start and why do we have grand juries? I think the record discloses that the attorney general of Michigan filed a petition for the grand jury and it was presented to a respected and honored judge, Judge Leland Carr. And Judge Carr proceeded to act as a one-man grand juror, and after that one-man grand jury got under motion it began to exercise the functions that grand juries are supposed to exercise, to uncover crime.    *    *    *

"Good old Judge Carr,—not me, the dishonest lawyer, but Judge Carr, who is respected by the people of Michigan, and Ralph Smith laid down his books, laid down his files, and he gave us evidence, lots of it. We didn't select him, we didn't put him there in 1939, they did. They have come in here now in their attempt to confuse and camouflage, trying to pass the buck, in plain English, to Ralph Smith. They can say anything they wish,—he is here because the grand jury brought him, got his records and found out the truth.    *    *    *

"And then we will go a step further, ladies and gentlemen. What kind of a foolish individual is a special prosecutor, or any other officer, who would subject himself to being called dishonest, covering up, the situation smells, it stinks.

"That is the defense.

"What is the effect upon the grand jury? You answer it.    *    *    *

"But, ladies and gentlemen, one day as I sat over in my office at Battle Creek, I received a telephone call from one of Michigan's eminent jurists, that same old Judge Carr, and for years I have learned to respect him. I looked upon him as a big man, not only physically, but in other ways, and he wanted me

to come over and help him clean up the graft. * * * But Judge Carr wanted me to come over and help clean up the graft and my partner said, 'It is your civic duty.' I said, 'O.K.,' and I came over, and I took an oath, ladies and gentlemen. * * *

"I would much rather be back there with Mom and the girls, taking care of my business, but here I have got to come in here and take that abuse and Charley Hemans had to take it and Joe Roosevelt had to take it and Judge Carr had to take it. What do you think about it? * * *

"Here I had been accused of being a dishonest lawyer, because I tried to help old Judge Carr clean up the mess.

"And then as I stood looking out, still gazing into space, I realized that 25 years of my life had been blasted by a remark of a big, good looking man, Mr. Conley,—then the thought dawned on me,—anything that can be said against Kim Sigler, hurts the grand jury. Why? Because he is special prosecutor. Anything that is said against Judge Carr, calling the grand jury a boarding school, hurts the grand jury. Certainly gentlemen, as Mr. Nelson brought out yesterday, some are charged with more than one defense [offense]. There are a lot of people who would like to see that grand jury fold up. * * *

"Judge Carr issued the warrant; I didn't issue the warrant. I had nothing to do with that. Judge Carr presided over the grand jury, and issued the warrant in this case. * * *

"Certainly the grand jury paid some of the out of pocket expenses of Charles Hemans and why shouldn't they? Charles Hemans has done more, despite all you can say about it, everything you want to call it, conceding if you will every adjective, every name they have used against him, but has John Hancock, has George Omacht, Mark Young, has Benzie, has Shea, has Logie done one solitary thing, no. But the crooks, the thieves, the drunken sheep herder, has come into court before Judge Carr

and helped. The people of the State of Michigan said we should clean up graft. * * *

"Certainly Joe Roosevelt has been paid his expenses. How many people do you think we could get to stand around and help us dig up this stuff without some expense money. Certainly Joe Roosevelt received some money. But who approved the expenses? Good old Judge Carr, in his wisdom and his prudence, because he believed it was for the best interest of the public, the people. * * *

"I want to say to you there is little thanks in Judge Carr working nights and days down there, long days, long nights, without a nickel extra compensation— there is little thanks for a special prosecutor to be working nights and days, hauling in witnesses from all kingdom come and going through records by the bale and then when you get somebody in who knows something about the facts and you pay their out-of-pocket expenses and treat them like human beings, then there is something wrong, it smells. * * *

"We took them—the grand jury, Judge Carr and myself, took them as we found them, and we have tried to bring them in fairly and honestly and present it to you, so that you, as good citizens of the county, could decide on what should be done."

The trial court gave the following charges to the jury:

"It is your duty as jurors to determine from the evidence in the case what the facts actually are. If the facts so determined by you are open to two interpretations, one indicating guilt and the other consistent with innocence, then it is your duty to give the defendant, or defendants concerned, the benefit of a reasonable doubt and accept that interpretation of the facts which tend toward his or their innocence."

"I charge you that the evidence comes from the testimony of the witnesses, and the evidence in the case that you have heard here upon the stand, and

you consider only that which was admitted in evidence; anything that was excluded or stricken out after it was received you will not consider."

We do not find that the defendant requested the court to charge the jury to disregard the remarks of the special prosecutor, moreover, we are of the opinion that the jury was definitely informed that the "evidence comes from the testimony of the witnesses." Without giving the court an opportunity to correct the claimed error, objections at this time come too late. Objections to argument not made at the trial, but made for the first time on appeal will not be considered. *People* v. *Goldberg,* 248 Mich 553; *People* v. *Connors,* 251 Mich 99; *People* v. *Korn,* 217 Mich 170; and *People* v. *Zesk,* 309 Mich 129.

It is also urged that the special prosecutor committed error in making the following statement to the jury:

"After I read those articles that were branding me throughout the State of Michigan where I had worked for a quarter of a century to try and build up a good name, I went to bed that night and along about 3 or 4 o'clock I awoke, I couldn't sleep. I laid there and tried to think, 'What in the world have I done to that man, what have I done to him,' I tried to recall everything that happened in this trial from the day we started until the time it happened. I couldn't sleep. Finally I got out of bed and I walked over there toward the window that looks toward and down,—looks down on the Capitol Building, and there was the old dome up there in the stillness of the night, and off there in one corner was the senate chamber and over here was the house chamber, and there was the chamber of the great Supreme Court that we respect. Here I had been accused of being a dishonest lawyer, because I tried to help old Judge Carr clean up the mess. I stood there, and I thought, 'What in the world was the man thinking of.' I wondered if it was because he was a member of the

assault gang. As I stood there looking out into the stillness of that night, trying to figure what the man had done and why he had done it, many things flashed through my mind. As I stood there I said to myself, 'Can it be possible that the defense have somebody on the jury they can trust and will do the things that Mr. Nelson was talking about—go to the jury room and don't give in,' that, in substance is what he said. 'Can it be possible that one of those good people down there is a friend of someone on the defense and is going to hang out regardless.' I said, 'No, that cannot be, because they are good honest citizens of a good community. They believe in law and good government. They don't believe that kind of stuff.'"

The claim is made that the above statement contains an intimation that the defendants were morally capable of "fixing" a member of the jury and that the result of such an argument was to coerce the jury. The line of argument was objected to, but the trial court ruled the objection came too late. Whether there is reversible error must depend upon all the circumstances of the particular case. Under some circumstances the prejudicial effect may be eliminated by proper procedure. See *People* v. *Rosa,* 268 Mich 462, and *People* v. *Cleveland,* 295 Mich 139.

The claimed prejudicial remarks do not come within the field of prejudicial remarks made in *People* v. *Bigge,* 288 Mich 417, or *People* v. *Nichols,* 159 Mich 355. In the *Bigge Case* defendant was convicted of fraudulent conversion of money. In his opening statement to the jury, the special prosecuting attorney said:

"On the 1st day of May, 1937, in Detroit where a conference was held with Mr. Bigge with one of his very close friends and a relative, the matter of his embezzlement was talked over at length by another witness who will testify in this case. They were going over various items of this embezzlement and

the amount, and what Charles had done with the money, and this person, his brother-in-law in fact, said to this witness who will testify, 'What's the use of going over this matter again. Charles is guilty as hell.'"

In *People* v. *Nichols, supra,* the prosecuting attorney stated to the jury:

"I will say, however, upon my official oath, that I know when Mr. Cunningham told certain things upon the stand he told the truth."

We there reversed the trial court for the reason that the statement of the prosecuting attorney was practically unsworn testimony corroborative of the testimony given by Mr. Cunningham. In the *Bigge* and *Nichols Cases* the prosecuting attorney by his statement to the jury offered unsworn testimony. We do not have that situation in the case at bar. In our opinion the argument was not so prejudicial as to warrant the granting of a new trial.

Other claimed prejudicial remarks are complained of, but we note that this case was hotly contested with the trial lasting approximately 2 months. We are unable to say that the statements made by the special prosecutor were such as to call for reversal. See authorities cited above.

It is also urged that the trial court erred in his charge to the jury in that he states as facts matters which were in issue; in stating claims of the prosecution matters not in dispute or issue; in repeatedly stating as though a fact that the conspiracy existed; in stressing prosecution's contentions without giving any equivalent statement of defendant's contentions; and in charging with reference to Senate Bill No 41 and other intent bills.

The record shows that on August 7, 1944, while the case was in progress, both the people and the de-

fendants filed requests to charge. We note that the trial court instructed the jury as follows:

"The information alleges that the conspiracy occurred in the county of Ingham and State of Michigan, between the 1st day of January, 1939, and on divers other days and times between that date and the 1st day of July, 1939."

In considering the various claims of the defendant with respect to the charge of the court, we have in mind that the charge should be construed as a whole. *People* v. *Clark,* 312 Mich 665.

Defendant points to the following statement in support of his claim that the trial court stated as a fact matters which were in issue:

"Already it has been called to your attention that the object of the conspiracy was to accomplish a purpose that was both unlawful and criminal."

This statement was wrested from the following charge to the jury:

"I have already defined to you the term 'conspiracy,' and have briefly outlined to you the respective claims of the people and of the defendants in relation to the conspiracy charge herein made. Already it has been called to your attention that the object of the conspiracy was to accomplish a purpose that was both unlawful and criminal. In other words, in the case at bar the type of conspiracy involved is one in which its unlawful character is derived out of and from a purpose that has been made unlawful and criminal by the laws of the State of Michigan."

The statement complained of, when considered with the entire paragraph from which it was lifted loses its force and was not a prejudicial statement or instruction. We have considered the claim that the trial court unduly stressed the claims of the prosecution and do not find any merit in it.

We have considered all claims of error pertaining to the instructions. In our opinion these claimed errors taken singly or as a whole do not constitute prejudicial error.

It is further contended that the verdict of the jury is against the great weight of the evidence. In support of this claim defendant urges that Hemans' story of graft and corruption insofar as it pertains to the finance defendants is a perversion of the truth; that it is implausible that Senate Bills Nos 85 and 166 were the subject of bribe conspiracy; that Hemans had no reason to bribe on these bills or pay out 'last night' bribes; and that no bribery agreement was entered into between Hemans and the finance group at the meeting held January 26th or at other times. We note that the finance group raised more than $8,000 to be paid to Hemans. While at least a part of this money was being raised, the finance group had already retained a Lansing attorney to perform legal services. There can be no dispute about Hemans being retained as a lobbyist and go-between. We think there was a question of fact as to whether there was a conspiracy to corrupt the legislature by means of bribery and also whether any or all of these defendants participated in such conspiracy. In coming to our conclusion on this phase of the case we have in mind that jurors are the sole judges of the facts (*People* v. *Miller,* 301 Mich 93); that they may believe one witness as against many (*People* v. *Petrosky,* 286 Mich 397); that where witnesses contradict themselves and each other, while testifying on the trial, their credibility is for the jury to determine (*People* v. *Franszkiewicz,* 302 Mich 144). The central figure and principal witness relied upon by the prosecution was Hemans, who according to his own testimony was engaged in bribery on a large scale. His credibility was a matter ably presented to the jury and properly so.

We find no prejudicial error committed during the trial of defendant and the judgment is affirmed.

BOYLES, C. J., and NORTH, J., concurred with SHARPE, J.

BUSHNELL, J. (*dissenting*). For the reasons stated in *People* v. *Omacht, post,* I am unable to agree with the conclusions reached by Justice SHARPE.

The conviction should be set aside and a new trial should be granted.

REID, J., concurred with BUSHNELL, J.

DETHMERS, BUTZEL, and CARR, JJ., did not sit.